*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0014P (6th Cir.)
File Name:  00a0014p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROYAL E. CLAYBROOK, JR.,
GWANNETTE CLAYBROOK,
PETRECE CLAYBROOK, CO-
ADMINISTRATORS OF THE
ESTATE OF ROYAL
CLAYBROOK, SR., and
QUINTANA CLAYBROOK,
　　　*Plaintiffs-Appellants,*

　　　　　*v.*

JESSE BIRCHWELL, STEVE
LEWIS, KEN SPENCER,
ROBERT KIRCHNER, and
METROPOLITAN
GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY,
　　　*Defendants-Appellees.*

No. 98-6029

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 96-00157—John T. Nixon, District Judge.

Argued:  August 10, 1999

Decided and Filed:  January 11, 2000

1

Before:  KRUPANSKY, BOGGS, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** E. E. Edwards III, EDWARDS, SIMMONS & OLIVER, Nashville, Tennessee, for Appellants. Kennetha Sawyers, THE METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY DEPARTMENT OF LAW, Nashville, Tennessee, for Appellees. **ON BRIEF:** E. E. Edwards III, Wesley M. Oliver, EDWARDS, SIMMONS & OLIVER, Nashville, Tennessee, for Appellants. Kennetha Sawyers, THE METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY DEPARTMENT OF LAW, Nashville, Tennessee, for Appellees.

KRUPANSKY, J., delivered the opinion of the court, in which BOGGS, J., joined. CLAY, J. (pp. 19-23), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

KRUPANSKY, Circuit Judge.  The plaintiffs-appellants Royal E. Claybrook Jr. ("Royal Jr."), Gwannette Claybrook ("Gwannette"), Petrece Claybrook ("Petrece"), and Quintana Claybrook ("Quintana") have disputed the district court's dismissal of their complaint for failure to state a claim, and/or its award of summary judgment to the defendants,[1] against the

---

[1]The district court cast its ruling as an alternate dismissal of the complaint for failure to state a claim and/or summary judgment adverse to the plaintiffs.

"Whether a district court has correctly dismissed a suit pursuant to Fed. R. Civ. P. 12(b)(6) [failure to state a claim] is a question of law, and therefore subject to *de novo* review. The district court must construe the

---

and Four of the complaint.  I would also reinstate the supplemental state law claims.

officers when Mr. Claybrook refused to throw down his gun, as opposed to firing at him. Indeed, the officers testified that they attempted to pull out their badges only "during the gunfire," or after the gunfire had already begun. Notably, there were no emergency circumstances present so as to require the officers to begin shooting without following protocol and without making a reasoned decision as to whether the vehicle was occupied. Accordingly, under these circumstances, a jury should decide whether the officers acted with deliberate indifference to Ms. Claybrook's rights. *See Lewis,* 118 S. Ct. at 1719 (noting the instances of "deliberate indifference" could be found in the context of pretrial custody where "forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare"); *see also Stemler v. City of Florence,* 126 F.3d 856, 868 (6th Cir. 1997) (suggesting that under substantive due process, "'a duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to danger'") (quoting *Gazette v. City of Pontiac,* 41 F.3d 1061, 1065 (6th Cir. 1994)). Reasonable minds surely could differ as to whether the plainclothes officers' decision to open fire on Mr. Claybrook at nine o'clock in the evening outside of a market in an area where patrons of the store could have been seated in their vehicles, when the officers admitted that they did not feel that they were in imminent danger, rose to the level of deliberate indifference to Ms. Claybrook's rights. Indeed, a reasonable person could conclude that officers who open fire on a public street at nine o'clock in the evening when they are in no imminent danger have every reason to believe that they may recklessly injure members of the public. Under the facts presented by this case, Ms. Claybrook should not be deprived of her right to trial on the question of whether the circumstances of the shooting violated her substantive due process rights.

Accordingly, I would reverse the district court's dismissal of Ms. Claybrook's claim against the officers for violation of her substantive due process rights as set forth in Counts Three

defendants-appellees Jesse Birchwell ("Birchwell"), Steve Lewis ("Lewis"), Ken Spencer ("Spencer"), Robert Kirchner ("Kirchner"), and the Metropolitan Government of Nashville and Davidson County, Tennessee ("Nashville"). The plaintiffs have alleged that peace officers Birchwell, Lewis, and Spencer used excessive force, in violation of 42 U.S.C. § 1983,[2] which resulted in the death of Royal Claybrook Sr.

---

complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citations omitted). Although the complaint's allegations are construed liberally for the plaintiff, a complaint which does not contain allegations sufficient to support a claim under *any* legal theory must be dismissed. *Id.* A court is not bound to accept alleged legal conclusions or unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

Following adequate opportunities for discovery and upon adversarial motion, summary judgment under Fed. R. Civ. P. 56 must be entered against a plaintiff who has failed to produce evidence sufficient to support each element of his or her *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Because sufficiency of the evidence is a question of law, a trial court's grant of summary judgment, like a dismissal under Fed. R. Civ. P. 12(b)(6), is subject to plenary scrutiny. *Painter v. Robertson*, 185 F.3d 557, 566 (6th Cir. 1999); *Grider v. Abramson*, 180 F.3d 739, 756 n.7 (6th Cir.), *cert. denied*, 120 S. Ct. 528 (1999).

[2]Section 1983 provides, in pertinent segment:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

In any action under section 1983, the plaintiff must prove that (1) he has been deprived of a right secured by the United States constitution or

("Claybrook") and the serious bodily injury of Quintana Claybrook. They further contended that Kirchner, as the Chief Executive Officer of the Nashville-Davidson County Metropolitan Police Department, failed to properly train and/or supervise the three faulted field officers, and neglected to develop appropriate official departmental guidelines restraining the unjustifiable utilization of lethal force. The trial court concluded that (1) Royal Jr., Gwannette, and Petrece Claybrook (the children of Royal Sr.) lacked standing to recover for alleged personal losses derivatively generated by their father's violent demise, and had failed to seek recovery for Claybrook's alleged constitutional injuries as representatives oft his estate; and (2) Quintana had suffered no cognizable constitutional tort.

On the evening of February 28, 1995, plainclothes caucasian undercover police officers Birchwell, Lewis, and Spencer of the Nashville Crime Suppression Unit were engaged in anti-crime surveillance, from an unmarked squad vehicle, in a high-crime Nashville neighborhood. At approximately 9:11 p.m., they observed an African-American male (later identified as Royal Claybrook Sr.) standing near the street curb in the dimly-lit parking lot of the F & J Market ("the market") while displaying a long gun at port-arms. A gray Maxima automobile blocked the business' entrance. The patrolmen knew that the market had been the target of recent crimes. Suspecting that a robbery was in progress, the driver of the incognito patrol car, Officer Birchwell, in conformity with his department's standard operating procedures, radioed the police force headquarters to report the gunman's location and to request the immediate dispatch of a marked police cruiser containing uniformed law enforcers.

Birchwell then drove the undercover vehicle into the market's parking lot. He intended to stop his vehicle on what

---

laws, (2) the defendants who allegedly caused that deprivation acted under color of state law, and (3) the deprivation occurred without due process of law. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994).

department rules requiring them to radio for a marked car and uniformed officers, and they made a conscious decision to request such support. The officers were also aware that the department rules mandated that they refrain from investigating the situation unless emergency circumstances arose. Significantly, at the point when they discovered Mr. Claybrook standing outside with this gun, Officer Birchwell testified that he did not believe that the officers were in imminent danger or that exigent circumstances requiring the use of force existed. However, after having made a decision to request backup, the officers inexplicably proceeded to engage Mr. Claybrook in a violent confrontation without awaiting the arrival of the uniformed officers. Contrary to the majority's assertion, the officers here were hardly involved in a high-speed pursuit or any high-pressure confrontation at the time that they decided to act, as were the officers in *Lewis*. *See* 118 S. Ct. at 1720-21. As such, Ms. Claybook's claims should be analyzed using the "deliberate indifference" standard; which is to say, her claim should be viewed in the context of whether the officers had time to make a reasoned judgment about their conduct. *Id.*; *see Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 373 (9th Cir. 1998) (recognizing that the critical question when applying the appropriate standard of culpability under *Lewis* is "whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct").

When viewing the officers' actions under this standard, questions of fact remain for the jury to decide with respect to whether the officers' conduct violated Ms. Claybrook's substantive due process rights. For example, questions of fact exist as to whether the officers observed Ms. Claybrook enter the car or reasonably should have known that Ms. Claybrook was in the car, in that if the officers passed by the market at the time they claimed, a reasonable person could believe that they observed Ms. Claybrook leaving the market and entering the car. Furthermore, a question of fact exists as to whether the officers should have provoked the confrontation with Mr. Claybrook before the uniformed back-up officers arrived, and whether they should have identified themselves as police

In *Lewis,* the Supreme Court reviewed the range of conduct under which a substantive due process claim may arise under the Fourteenth Amendment. *See* 118 S. Ct. at 1717. The Court began by reiterating the long-held standard that one may state a claim of deprivation of substantive due process by alleging conduct "'that shocks the conscience' and violates the 'decencies of civilized conduct.'" *Id.* (quoting *Rochin v. California,* 342 U.S. 165, 172-73 (1965)). However, the Court went on to recognize that the measure of "what is conscience-shocking is no calibrated yard stick," and observed that "[r]ules of due process are not . . . subject to mechanical application [such that] [d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." *Id.* at 1717-1719. The Court emphasized that liability may lie for actions that amount to "deliberate indifference" where the officials involved enjoyed the luxury of "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Lewis,* 118 S. Ct. at 1720. The Court explained as follows:

> When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness, fails to inch close enough to harmful purpose to spark the shock that implicates "the large concerns of the governors and the governed."

*Id.* (quoting *Daniels v. Williams,* 474 U.S. 327, 332 (1986)).

When conducting an "exact analysis" of the facts of this case in the light most favorable to Ms. Claybrook, it is clear that the officers had sufficient time to make an unhurried judgment about their conduct upon seeing Mr. Claybrook with his weapon such that a lower level of fault should be applied. As the officers testified, they were aware of

appeared to be a driveway or alleyway which abutted the building's western side, to enable the officers to surreptitiously observe the firearm-toting suspect and the suspicious gray automobile, pending arrival of the summoned marked squad car. However, Birchwell subsequently discovered that no contiguous roadway paralleled the structure's west end. Consequently, while repositioning his vehicle to prevent the armed suspect from facing the officers' backs, Birchwell maneuvered the unidentified patrol car towards the stationary gray automobile.

That movement prompted the wary gunman to advance menacingly behind the hood of the gray Maxima while facing the intruders. Unbeknownst to the peace officers, Claybrook's daughter-in-law, Quintana Claybrook, worked at the market. Because that establishment served as a "front" for an unlawful "numbers" gambling operation, thieves occasionally targeted it. Quintana was responsible for depositing illegal betting proceeds. The associated physical danger prompted Claybrook habitually to escort Quintana, while armed, from the store to her automobile. He customarily remained in the parking lot, holding his shotgun in plain view, until Quintana had exited the area. Claybrook was acting as a security guard for his daughter-in-law on the evening of February 28, 1995. When the unmarked police vehicle arrived at the scene, Quintana was already inside the Maxima, seated behind the steering wheel with her back towards the three defendant peace constables, although each of them testified that he did not know that anyone then occupied that automobile.

Quintana testified that a passenger within the strange vehicle (the unmarked police car) ordered Claybrook to drop his weapon, to which he responded, "no, you drop your gun." She further attested:

> And then the next thing I know, I heard like a firecracker sound, and then I felt something in my back, and I kind of jumped, like, you know. And I really didn't

know what had happened, because, you know, I hadn't heard a gun shot, you know, before.

And then I kind of felt like I was wet, and so I kind of felt, and I was like, you know, -- and then I realized that I had been shot. And I kind of leaned over in the seat, and I looked up at my father-in-law, and he looked at me. He was still standing in front of my car.

And then I just -- you know, I saw like -- I guess it was a burst of fire or something. I don't know what it was. It was just like some fire or something. And I heard a big boom. And then I just heard a whole bunch of just fireworks and, you know. And then I heard another boom.[3]     And I was like, we're getting robbed. Somebody's robbing us.

Tragically, Quintana's back had been struck by a stray bullet. She testified that she unsuccessfully attempted to telephone "911" on her cellular phone. She then called her husband, Royal Jr., to report that armed assailants were attempting to rob her and Claybrook. However, because she crouched inside her vehicle following the initial volley, she did not witness the shoot-out.

During much of the ensuing firefight, Claybrook shielded himself behind the Maxima. Rounds discharged by Claybrook struck the windshield, hood, and door of the officers' cruiser. The three police officers testified, contrary to Quintana's assertion, that Claybrook discharged his firearm at least twice before they were able to return the assailant's fire. They further asserted that, following the initial exchange of gunfire, they endeavored to identify themselves as police officers by verbalizations reinforced by manual displays of their official badges which each wore on a neck chain. Nevertheless, Claybrook continued to shoot at them. Officer

---

[3]Birchwell testified that "it's very easy to distinguish a pistol shot from a shotgun. A pistol shot is sort of like a firecracker," while "a shotgun is a deep, low boom."

## CONCURRING IN PART, DISSENTING IN PART

CLAY, Circuit Judge, concurring in part and dissenting in part. I concur in the majority's decision to reverse the district court's dismissal of Counts One and Two of the complaint; however, because I believe that the district court's dismissal of Counts Three and Four should also be reversed, I respectfully dissent from the majority's decision to affirm the dismissal of these counts.

I disagree with the majority's application of what it considers to be the appropriate standard under which the substantive due process claim of Quintana Claybrook ("Ms. Claybrook"), as set forth in Counts Three and Four, should be analyzed. The majority applies the "conscious shocking" standard used for situations involving instances when police officers are called to make "fast action[s]" such as when facing an ensuing prison riot or when in the throes of a high-speed chase. Under such circumstances, a much higher standard of fault, such as "'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm,'" must be shown in order to hold a police officer liable. *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S. Ct. 1708, 1720 (1998) (quoting *Witley v. Albers,* 475 U.S. 312, 320 (1986)). Because the record does not support the majority's application of this standard, the less stringent standard of culpability – that which is considered "something more than negligence but less than intentional conduct, such as recklessness or gross negligence" – should be applied. *See Lewis,* 118 S. Ct. at 1718 (internal quotation marks omitted). Under this standard, coined by the Supreme Court as "deliberate indifference," a question of fact remains for trial as to whether the officers' conduct regarding Ms. Claybrook rose to this level.

Furthermore, because the charged official conduct did not inflict any constitutional deprivation upon Quintana, defendant Kirchner, in his official capacity as the Chief Executive Officer of the Nashville-Davidson County Metropolitan Police Department, cannot be liable to her for any alleged neglect to train or supervise those officers, or failure to develop appropriate deadly force policies; therefore the lower court's summary dismissal of count four was also proper. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of unconstitutionally excessive force is quite beside the point.") (emphasis the Court's).

Accordingly, the summary judgments for the defendants which disposed of counts three and four of the amended complaint are **AFFIRMED**; whereas the summary dismissals of counts one and two are **REVERSED**, and the action **REMANDED** for further proceedings concerning those two causes of action as are consistent with this opinion.

Birchwell sustained gunshot wounds to his right thigh and knee and left foot. He then reported to the police dispatcher, via radio, that shots had been fired, and again requested immediate back-up assistance. At approximately that time, the suspected perpetrator fled behind the market. However, apparently rejecting the available option of escaping unharmed by means of an adjacent street, Claybrook circumambulated the structure in a bid to ambush the agents from the rear.

Claybrook concealed himself behind a slightly elevated concrete structure which afforded a dominant strategic firing posture. Each of the three officers testified that they once again warned the assailant to drop his weapon. Instead, he aimed his shotgun directly at them. The officers defensively fired at the suspect, bringing him to the ground. Approximately at that same moment, marked police units transporting uniformed officers, as well as an ambulance containing emergency medical technicians ("EMTs"), arrived at the scene. The entire incident had transpired within only one or two minutes.

Claybrook, pronounced dead at the scene, had sustained a mortal head wound. Upon discovering the seriously injured Quintana inside the Maxima, the EMTs rushed her to Vanderbilt University Hospital, where she received emergency medical attention and subsequent extended hospitalization.

On February 12, 1996, the plaintiffs instigated a complaint in district court under section 1983 and Tennessee law. Count one asserted that Royal Jr., Gwannette, and Petrece Claybrook, as the "heirs at law" of their deceased father, suffered injuries consequent to the three defendant officers' alleged violations of their parent's civil rights. Via Count two, Claybrook's three children sought recovery from Robert Kirchner, the Chief Executive Officer of the Nashville-

Davidson County Metropolitan Police Department,[4] for his alleged failure to (1) properly train and/or supervise the three police officer defendants and/or (2) implement adequate departmental policies circumscribing the application of deadly force. Count three advanced the claims of Quintana and her husband Royal Jr. for the officers' averred infringements of Quintana's civil rights. Count four articulated Quintana's claim against Kirchner anchored in allegations similar to those stated in count two. Count five, asserted by all plaintiffs, alleged that Birchwell, Lewis, and Spencer had committed state law torts.[5]

Each of Claybrook's three children requested $125,000 in actual damages, plus an equivalent sum in punitive damages, against each defendant. Quintana sought $250,000 in compensatory damages for her personal injuries, plus an equivalent amount of punitives, against each defendant. The plaintiffs further petitioned for an award of attorney fees under 42 U.S.C. § 1988(b), an equitable declaration that the Nashville police had violated their civil rights, and an injunction compelling reform of the Nashville police department's deadly force policies.

Following the lodging of the defendants' answers to the initial complaint, the plaintiffs, on May 23, 1996, filed a four-count amended complaint which reiterated, with

---

[4]On April 10, 1997, the district court dismissed all claims asserted against Chief Robert Kirchner in his individual capacity, but retained him as an official capacity defendant, which ruling is not before this appellate forum. An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Municipalities and counties are "persons" exposed to litigation under section 1983. *Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir.), *cert. denied*, 522 U.S. 914 (1997).

[5]On April 10, 1997, the trial judge dismissed count five with prejudice in the exercise of its statutory discretion to decline to extend supplemental jurisdiction over a state law claim. 28 U.S.C. § 1367(c). That mandate is not before this reviewing forum.

---

that no conscience-shocking behavior was implicated by a deputy sheriff's emergency enlistment of a civilian bystander's assistance in subduing a dangerous assailant which prompted the perpetrator to slay the civilian),[14] *cert. denied*, 119 S. Ct. 869 (1999).

Indeed, the record reflected, without contradiction, that the three defendant undercover agents did not know that anyone was present in the gray Maxima prior to, or during, the exchange of gunfire which caused Quintana's injury. Thus, the defendants could not have acted maliciously or sadistically towards that unknown individual. *See Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994) (explaining that malicious or sadistic behavior entails unjustifiable intentional conduct undertaken with the direct purpose of causing harm to the victim).

Hence, construing all supported allegations and record evidence most favorably for Quintana, no rational fact finder could conclude that Officers Birchwell, Lewis, and/or Spencer violated her substantive due process rights, because the plaintiff cannot prove that they acted with malice or sadism towards her. Thus, the lower court's summary judgment for those defendants on count three of the amended complaint was correct. *See Lewis*, 118 S. Ct. at 1714 n.5.

---

[14]The *Radecki* court explained:

Deputy Barela had no time for deliberation. The undisputed facts in this record make clear that Deputy Barela was confronted with the kind of instantaneous judgment call that is so often required of law enforcement personnel, prison officials, and many other government actors called to emergency situations. Sometimes these decisions are negligent, sometimes they are even reckless, sometimes indifferent. Under these circumstances, however, where Plaintiffs have not even alleged that Deputy Barela acted with an intent to harm the participants or to worsen their legal plight, under the *Lewis* standard there is no constitutional liability.

*Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 869 (1999).

prompted by "unforeseen circumstances [which] demand[ed] an officer's instant judgment," to a prison riot. *Id*. Thus, the more exacting "malicious or sadistic" standard of proof, rather than the comparatively relaxed "deliberate indifference" evidentiary criterion, controlled the "shocks the conscience" substantive due process element. *Id*. at 1720-21. Similarly, the "malicious or sadistic" test of conscience-shocking behavior controls the instant action because, beyond controversy, Officers Birchwell, Lewis, and Spencer had no opportunity to ponder or debate their reaction to the dangerous actions of the armed man.[13]

Hence, even if, as the plaintiffs have argued, the actions of the three defendant patrolmen violated departmental policy or were otherwise negligent, no rational fact finder could conclude, even after considering the evidence in the light most favorable to Quintana, that those peace enforcement operatives acted with conscience-shocking *malice* or *sadism* towards the unintended shooting victim. *Lewis*, 118 S. Ct. at 1721 (dictating that, "[r]egardless whether [Deputy] Smith's behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practices, it does not shock the conscience, and petitioners are not called upon to answer for it under § 1983."). *See Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998) (concluding

---

[13]The plaintiffs' contention that the defendant officers wrongfully incited the violence which injured Quintana by entering the parking lot and driving towards the stationary gray vehicle was misconceived. *See Lewis*, 118 S. Ct. at 1720-21. As the Seventh Circuit has commented:

Other than random attacks, all such cases [involving the use of force by criminal justice personnel] begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994).

---

modifications,   causes one through four of their original complaint. However, the plaintiffs added, *inter alia*, language to their complaint intended to clarify that Royal Jr., Gwannette, and Petrece Claybrook did not seek satisfaction for alleged losses personal to themselves; rather, they were prosecuting the instant action, as representatives of the decedent's estate, for compensation of Claybrook's pre-death constitutional deprivations. The caption of the amended complaint listed the plaintiffs as:

ROYAL E. CLAYBROOK, JR., GWANNETTE CLAYBROOK, PETRECE CLAYBROOK, **CO-ADMINISTRATORS OF THE ESTATE OF ROYAL E. CLAYBROOK, SR.**, AND QUINTANA CLAYBROOK[.]

(Boldface added).

The two counts advanced by Claybrook's three children related:

### COUNT ONE

33. On the basis of the allegations in paragraphs 1 through 32 [generally averring the plaintiffs' version of the events of February 28, 1995], defendants Birchwell, Lewis and Spencer are liable, both jointly and severally, to plaintiffs Royal E. Claybrook, Jr., Gwannette Claybrook and Petrece Claybrook, the heirs at law of Royal E. Claybrook, Sr., for the defendants' conduct, individually and in concert, to violate the civil rights of Royal E. Claybrook, Sr. under the First, Second, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution. These rights include the right to be free from unlawful arrest and from unreasonable and excessive use of police force, to freedom of movement, to keep and bear arms, to be free from cruel and unusual punishment, to due process of law and to equal protection of law.

## COUNT TWO

34.  On the basis of the allegations in paragraphs 1 through 32, defendant Robert Kirchner is liable to plaintiffs Royal E. Claybrook, Jr., Gwannette Claybrook and Petrece Claybrook, the heirs at law of Royal E. Claybrook, Sr., for his failure to develop policies and procedures, to properly train police conduct [sic] in undercover activities, to train with regard to the use of deadly force and to supervise and regulate adequately so as to protect Royal E. Claybrook, Sr. and to prevent the violations of the said Claybrook Sr.'s rights as alleged in paragraph 30 [paragraph 33?] above.

Additionally, the amended complaint alleged (1) the parent-child relationship of Claybrook to Royal Jr., Gwannette, and Petrece (paragraphs one through four); (2) that "Plaintiffs Royal, Gwannette and Petrece Claybrook are co-administrators of the Estate of Royal E. Claybrook, Sr." (paragraph six); and (3) that "[a]s a result of the wrongful acts of the defendants, plaintiffs Royal E. Claybrook, Jr., Gwannette Claybrook and Petrece Claybrook incurred medical and funeral expenses, as well as great emotional loss associated with the wrongful death of their father." (paragraph thirty-one).  Furthermore, the plaintiffs' Prayer for Relief sought personal compensatory and punitive damage awards for each of them, as well as collective equitable relief, in conformity with their original complaint's prayer; but it did not expressly request any relief for the Estate of Royal E. Claybrook, Sr..

Following discovery, the district court, on July 1, 1998, granted the defendants' motions for dismissal of the amended complaint and/or summary judgment.  The plaintiffs noticed a timely appeal on July 20, 1998.

In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort.  *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984).  *See also Purnell v. City of Akron*, 925 F.2d 941, 948-49 n.6 (6th Cir. 1991); *May v. County of Trumbull*, 127

Fundamentally, the substantive component of the due process clause insulates citizens against the arbitrary exercise of governmental power. *Id*. at 1716.  Accordingly, conduct of a law enforcement officer towards a citizen which "shocks the conscience" denies the victim fundamental substantive due process.  *Id*. at 1717.  In situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action (such as, for example, most occasions whereby corrections officials ignore an inmate's serious medical needs), their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights. *Id*. at 1719.  In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation (such as, for example, a prison riot), public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline[.]"[12] *Id*. at 1720 (citation omitted).

Applying those principles, the *Lewis* Court analogized a high-speed motorcycle chase, which led to the accidental death of the pursued motorbike's innocent passenger,

---

[12] As aptly observed by the *Lewis* Court:

[T]he police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs.  They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance.

*County of Sacramento v. Lewis*, 118 S. Ct. 1708, 1720 (1998) (citations omitted).  *See also Graham v. Connor*, 490 U.S. 386, 397 (1989) ("police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.").

[sic] in undercover activities, to train with regard to the use of deadly force and to supervise and regulate adequately so as to protect Quintana Claybrook and to prevent the violations of the said Quintana Claybrook's rights as alleged in paragraph 32 [paragraph 35?] above.

On review, Quintana has disputed only the trial court's dismissal of her Fourteenth Amendment substantive due process claim.[10] Ordinarily, a charge that law enforcement personnel used excessive force to effect a plaintiff's arrest, which caused bodily injury to that individual, is assessed under Fourth Amendment "objective reasonableness" standards.[11] *Graham v. Connor*, 490 U.S. 386, 394-97 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7-9 (1985). Accordingly, when an arrestee is "seized" by means of deadly force, any dependent section 1983 claim initiated by the target, or his or her estate, must be supported by proof that, under the pertinent circumstances, the means used to detain the suspect were objectively "unreasonable." *Id*. However, the Fourth Amendment "reasonableness" standard does not apply to section 1983 claims which seek remuneration for physical injuries *inadvertently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator, because the authorities could not "seize" any person other than one who was a deliberate object of their exertion of force. *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989). Rather, constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of an attempted official "seizure" are adjudged according to substantive due process norms. *County of Sacramento v. Lewis*, 118 S. Ct. 1708, 1714-16 (1998).

---

[10]The Fourteenth Amendment to the United States Constitution stipulates, in pertinent segment, that "No state shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

[11]The Fourth Amendment posits, in relevant portion, that "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated[.]" U.S. Const. amend. IV.

F.3d 1102 (Table), 1997 WL 651662, at **4 (6th Cir. Oct. 20, 1997) (*per curiam*); *Tinch v. City of Dayton*, 77 F.3d 483 (Table), 1996 WL 77445, at **1 (6th Cir. Feb. 20, 1996) (*per curiam*). Accordingly, only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members. *Id*. Despite the amended complaint's caption, which named plaintiffs Royal Jr., Gwannette, and Petrece as co-administrators of Claybrook's estate, coupled with an express allegation at paragraph six to that same effect, the district court construed counts one and two as seeking only compensation for alleged personal losses and suffering experienced individually by Claybrook's three children. Consequently, the district court dismissed counts one and two because the plaintiffs lacked standing to initiate personal claims stemming from alleged violations of their deceased father's federally protected liberties.[6]

Upon *de novo* review of a trial court's dismissal of a complaint under Rule 12(b)(6), the allegations of the complaint should be construed liberally in the plaintiffs' favor. *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 405 (6th Cir. 1998). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no* set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (emphasis added; note omitted). In this case, the lower court dismissed counts one and two on the sole rationale that the plaintiffs had failed to plead that they sought damages as representatives of their deceased father's estate for his alleged constitutional injuries. However, plenary scrutiny of the material allegations of the amended complaint reveals that, when construed in the light most

---

[6]Because the lower court's analysis of counts one and two focused exclusively upon the sufficiency of the amended complaint's allegations, this review construes the trial court's dismissal of those causes of action as a Rule 12(b)(6) dismissal for failure to state a claim.

favorable for the plaintiffs, they have adequately requested compensation for Claybrook's alleged constitutional injuries in their representative capacities as co-administrators of his estate.

Notwithstanding that certain allegations of the amended complaint also appear to aver that Claybrook's children suffered personal losses caused by the defendants' alleged impingements of their decedent's constitutionally safeguarded interests, which created some ambiguity regarding the identity of the person(s) whose injuries in fact were asserted in counts one and two, this reviewing forum regards those extraneous allegations to constitute mere surplusage which ultimately have no substantive effect. Because the plaintiffs have unequivocally alleged in plain language that they have prosecuted the subject action as the co-administrators of Claybrook's estate, matched with clear allegations in counts one and two that the defendants' actions had deprived *Claybrook* of his civil rights, it cannot be said that they have pleaded *no* set of facts in counts one and two which could conceivably entitle them, as representatives of Claybrook's estate, to relief. Accordingly, the district court's dismissal of counts one and two for failure to state a claim, which was justified solely on the rationale that the plaintiffs had not pled that they sought recovery for their late parent's injuries as representatives of his estate, constituted legal error. Hence, the Rule 12(b)(6) dismissals of counts one and two are **reversed**, and the case **remanded** to the district court for further proceedings regarding those causes of action as are consistent with this decision.[7]

_____

[7]This court emphasizes that, as to counts one and two of the amended complaint, it rules only that the plaintiffs have sufficiently alleged that they are seeking monetary compensation, as the co-administrators of the decedent's estate, for alleged constitutional torts personally suffered by Claybrook, which affords them standing as vindicators of Claybrook's individual federal rights to the extent that his tort claims survived, under Tennessee law, beyond his own death. *See Jaco v. Bloechle*, 739 F.2d 239, 241-45 (6th Cir. 1984); Tenn. Code Ann. §§ 20-5-102 & 106 (1994 & Supp. 1998). This reviewing forum expresses no opinion regarding the substantive merits of any claim asserted within counts one and/or two of

By contrast, the district court correctly resolved that counts three and four of the amended complaint were not supported by sufficient evidence.[8] Those causes of action recited:

### COUNT THREE

35. On the basis of the allegations in paragraphs 1 through 32, defendants Birchwell, Lewis and Spencer are liable, both jointly and severally, to plaintiff Quintana Claybrook for the defendants' conduct, individually and in concert, to violate the civil rights of Quintana Claybrook under the First, Second, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. These rights include the right to be free from unlawful arrest and from unreasonable and excessive use of police force, to freedom of movement, to keep and bear arms, to be free from cruel and unusual punishment, to due process of law and to equal protection of law. Said defendants are liable to plaintiff Royal E. Claybrook, Jr. for the loss of companionship, love and affection of his wife, Quintana Claybrook.[9]

### COUNT FOUR

36. On the basis of the allegations in paragraphs 1 through 32, defendant Robert Kirchner is liable to plaintiff Quintana Claybrook for his failure to develop policies and procedures, to properly train police conduct

_____

the amended complaint.

[8]Because consideration of the sufficiency of the record evidence is necessary to dispose of counts three and four, as developed below, this review construes the lower court's rejection of those causes of action as a summary adjudication. *See* Fed. R. Civ. P. 12(b) & 56.

[9]For the reasons developed above, Royal Claybrook Jr. lacks standing under section 1983 to claim compensation for any indirect injuries allegedly caused to him by reason of any constitutional tort suffered by his spouse Quintana Claybrook, irrespective of the potential merits of Quintana's personal claims.